UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Ramin Parsey, M.D., Ph.D.,

                Plaintiff,

           v.

Maurie McInnis, Ph.D., William
Wertheim, M.D., and Stony Brook
University,

                Defendants.

21-CV-6064 (NRM) (AYS)

**MEMORANDUM AND ORDER**

**NINA R. MORRISON**, United States District Judge:

     Plaintiff Ramin Parsey is a tenured professor at the Renaissance School of Medicine at Stony Brook University, which is a subdivision of the State University of New York (SUNY). He argues that he was removed as Chair of the Psychiatry Department at the School of Medicine on the basis of his race and national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and New York State Human Rights Law. He also raises causes of action under the New York Labor Law § 741 and the New York State False Claims Act, through the New York State Finance Law § 191. Defendants move for summary judgment against Plaintiff's equal protection claim, arguing that he was terminated for how he handled the conduct of a subordinate, and against his state law claims. For the reasons that follow, the Court grants Defendants' motion with regard to Plaintiff's equal protection claim, raised pursuant to 42 U.S.C. § 1983, and declines to exercise supplemental jurisdiction on Plaintiff's state law claims.

1

## FACTUAL BACKGROUND

The following facts and procedural history are taken from Plaintiff's complaint (insofar as those facts are undisputed), the parties' Statements of Material Facts submitted with the motion for summary judgment in accordance with Local Civil Rule 56.1, and the underlying record.

Plaintiff Ramin Parsey is a tenured professor at the Renaissance School of Medicine at Stony Brook University (SBU). Pl. Dep. Tr. 8:8–10,[1] ECF No. 51-4 ("Pl. Dep. A").[2] He held the position of Chair of the School's Psychiatry Department from the beginning of his employment in 2012, *see* Pl. Dep. A 7:25–8:4, until on or about September 2, 2021, when Defendant Dr. William Wertheim removed him from his position as Chair. Compl. ¶ 36, EFC No. 1. Plaintiff retained his tenured position as a Professor at the School of Medicine and continues to serve on the faculty. *See* Compl. ¶ 2. He identifies as a "Middle Eastern male of Iranian national origin." *Id.*

Dr. Wertheim was appointed to serve as the Interim Dean of the School of Medicine in February 2021, Wertheim Dep. Tr. 14:18–25, ECF No. 51-7 ("Wertheim

---

[1] Pincites to deposition transcripts refer to the internal transcript pagination of those transcripts; for all other record citations, pincites refer to the pagination generated by the federal courts' Case Management/Electronic Case Files system (CM/ECF).

[2] Because Plaintiff's deposition is excerpted in different ECF filings, the Court labels the filings that include transcript excerpts from Plaintiff's deposition as "A" and "B."

Dep. A"),[3] and served in that capacity until September 2022. *Id.* at 15:2–3. Since September 2022, Dr. Wertheim has been serving as the School's Vice Dean for Academic Affairs. *Id.* at 15:3–4.

Defendant Maurie McInnis is the President of Stony Brook University; she assumed that role in July 2020. McInnis Dep. Tr. 8:14–15, ECF No. 51-10.

## I.    Conduct of Plaintiff's Subordinate Dr. Manju Koola and Plaintiff's Response

Defendants argue that Plaintiff was removed as Chair of the Psychiatry Department not due to his race or national origin but due to how he mishandled the Department's responses to certain conduct by his subordinate Dr. Manju Koola, who was a part-time faculty member with the Psychiatry Department and served as an attending in the Adult Psychiatric Inpatient Unit. Memorandum from Ramin Parsey to Kenneth Kaushansky, Dean, Sch. of Med. (Sept. 30, 2019), ECF No. 51-11.

Much of the conduct by Dr. Koola was discussed over emails that were produced in discovery and that the parties discuss in their motion papers:

On December 16, 2019, Plaintiff emailed Dr. Koola and stated that while at a meeting of the American College of Neuropsychopharmacology, "three people from fairly high up in the organization" asked Plaintiff to "ask [Dr. Koola] politely to stop sending emails." Ex. 9 to Def. Mot. for Summ. J. 65 ("Def. Mot."), ECF No. 51-12. Plaintiff informed Dr. Koola that "[i]n general I have gotten this concern from others

---

[3] Because Dr. Wertheim's deposition is excerpted in different ECF filings, the Court labels the filings that include transcript excerpts from Dr. Wertheim's deposition as "A," "B," and "C."

here as well.  Our relationship with NIH is critical and now that you are [at] [S]tony [B]rook, it reflects badly on the institution.  Can you please stop?"  *Id.*; *see* Pl. Dep. A 35:25–36:14; Pl. Response to Def. 56.1 Statement ¶ 16, ECF No. 33-1.[4]

On May 28, 2020, Plaintiff was forwarded an email that Dr. Emily Hill, Director of the 10 North Inpatient Unit, to whom Dr. Koola reported, received from Dr. Koola on that date.  Ex. 9 to Def. Mot. at 44; *see* Pl. Dep. A 40:15–18; 60:13–18. In that email, Dr. Koola stated he would not show up to work on Fridays anymore and that "[i]f it is a problem for the leadership, ask them to go to hell and/or commit suicide. ha. ha."  Ex. 9 to Def. Mot. at 45.  In response to that email on the same date, Plaintiff told Dr. Koola that his language was "appalling, concerning, and completely unprofessional."  *Id.* at 44.  Plaintiff told Dr. Koola he would receive a written admonition that would be placed in his official record and to "[c]onsider this [his] first warning."  *Id.*  In an email dated July 27, 2020, Plaintiff referred to Dr. Koola's "words and attitude" as "deeply offensive and rude" and told Dr. Koola, "another single event and our work together is done."  *Id.* at 42.  After Dr. Koola asked for the admonition to be removed from his file, Plaintiff replied in an email dated July 28, 2020 that the admonition "c[ould not] be removed from [his] file" as it was a "fireable offense."  *Id.* at 40.

---

[4] In response to Defendants' motion for summary judgment, Plaintiff relies on his responses to Defendant's Rule 56.1 Statement submitted with Defendants' request for a pre-motion conference on their then-anticipated motion for summary judgment.  *See* Def. Mot. for Pre-Motion Conf., ECF No. 30; Pl. Response in Opp'n to Def. Mot. for Pre-Motion Conf., ECF No. 33.

On May 28, 2020, Plaintiff emailed Assistant Dean of Faculty Personnel Karen Wilk and copied Vice Dean for Administration and Finance John Riley about Dr. Koola's email referencing "suicide." Def. Response to Pl. Rule 56.1 Counterstatement ¶ 13, ECF No. 55-1. Plaintiff wrote to Wilk that he would "like to give [Dr. Koola] a rather stern official warning. What do you suggest? Email? Letter? Meeting with HR?" *Id.* Wilk responded that Plaintiff should have a discussion with Dr. Koola followed by an email or letter advising him that "this unprofessional behavior is inappropriate and unacceptable will not be tolerated, etc." *Id.* ¶ 17. Wilk instructed Plaintiff to maintain a file documenting similar instances in case he decided to non-renew Dr. Koola's contract later on and stated "[i]f this is an isolated incident, it is probably premature to involve [human resources] or [labor relations]." *Id.* (second and third alterations in original). Dr. Wertheim testified that Wilk was "a reasonable person to refer [the email] to." Wertheim Dep. Tr. 98:2–9, EFC No. 33-8 ("Wertheim Dep. B"); *see* Def. Responses to Pl. Rule 56.1 Counterstatement ¶ 15. On Plaintiff's copying of Riley on the email, Dr. Wertheim testified that Riley "is not H.R., but he is a reasonable person with him to have a discussion about where to go." Wertheim Dep. B 98:18–99:7.

In an email dated September 10, 2020, Plaintiff told Dr. Koola that a senior scientist at the University of Maryland had asked if Plaintiff "can get [Dr. Koola] to stop sending so many emails." Ex. 9 to Def. Mot. at 38. Plaintiff asked Dr. Koola, "[p]lease reduce your emails, you are doing more damage to yourself and your future career than you realize." *Id.*

On November 6, 2020, Dr. Koola forwarded to Plaintiff and others an email he wrote that day to Dr. Hill, in which he stated, "Unit is cute when it's acute. Like wife is cute when she is mute!!!" *Id.* at 31; Pl. Response to Def. 56.1 Statement ¶ 25. In an email dated November 9, 2020, Plaintiff told Dr. Koola this would be his "last warning before we notify the Title IX office and start official termination proceedings." Ex. 9 to Def. Mot. at 31; Pl. Response to Def. 56.1 Statement ¶ 26.  Plaintiff told Dr. Koola to take an online course about sexual harassment and creating a hostile work environment and told him "[w]e will not tolerate this kind of behavior." Ex. 9 to Def. Mot. at 31.

Also on November 6, 2020, a professor at the University of Maryland, Dr. Deanna Kelly, emailed Plaintiff, with the subject "Faculty harassment," that Dr. Koola had sent 147 "mostly antagonistic" emails since January 2020. *Id.* at 28; Pl. Response to Def. 56.1 Statement ¶¶ 27–28.  Kelly told Plaintiff Dr. Koola's actions were "very concerning" and that she was "very concerned." Ex. 9 to Def. Mot. at 28; Pl. Response to Def. 56.1 Statement ¶ 29.  Kelly told Plaintiff that she was not the only faculty at the University of Maryland receiving unwanted emails from Dr. Koola. Ex. 9 to Def. Mot. at 28; Pl. Response to Def. 56.1 Statement ¶ 30.  On November 9, 2020, Plaintiff emailed Dr. Koola and told him to "stop immediately." Ex. 9 to  Def. Mot. at 28. Plaintiff wrote that "[t]his is the third time I have asked you to stop emailing people at Maryland" and that "[t]his isn't good for anyone." *Id.*

On February 5, 2021, someone affiliated with the University of Maryland, Will Carpenter, emailed Plaintiff and informed him that Dr. Koola had paid an uninvited

visit to the widow of a psychiatrist who had been beaten to death by a patient.  Ex. 9 to Def. Mot. at 24.  Carpenter told Plaintiff that Dr. Koola's visit took place at night. *Id.* The email stated that Dr. Koola sought entrance into the woman's house and sought to take pictures.  *Id.*  The woman did not want to involve the police at that time, but indicated that if it happened again, she planned to take action against Dr. Koola.  *Id.*  Plaintiff forwarded the February 5, 2021 email to Dr. Koola on February 8, 2021 and wrote "Please stop this activity."  *Id.*; Pl. Response to Def. 56.1 Statement ¶ 37.  Plaintiff did not report the incident described in Will Carpenter's email to Dr. Wertheim.  Wertheim Decl. ¶¶ 58, 59; Pl. Response to Def. 56.1 Statement ¶ 39.

On April 20, 2021, Plaintiff emailed Dr. Koola and informed him that "[t]his week ALONE I get emails from [non-SBU faculty] Jeff Liberman and John Krystal" and that Dr. Koola was "embarrassing [him]self and our department with your other emails."  Ex. 9 to Def. Mot. at 22; Pl. Response to Def. 56.1 Statement ¶ 43.

On April 21, 2021, after Dr. Koola asked Plaintiff to nominate him for a position, Plaintiff emailed Dr. Koola, "No more letters of support while you continue to send inappropriate emails to our friends and colleagues.  If we go six months with no complaints I will be delighted to support your career."  Ex. 9 to Def. Mot. at 21.  Dr. Koola replied that he was "EXTREMELY SORRY" and asked Plaintiff to reconsider.  *Id.* at 20.  Plaintiff responded that, "you have sent these emails out to many people over the whole time you are here. You have been asked multiple times to stop doing so."  Ex. 9 to Def. Mot., at 18; *see* Pl. Response to Def. 56.1 Statement ¶ 44.

On June 18, 2021, Laura Rowland at the University of Maryland, Baltimore forwarded Plaintiff an email (also dated June 18, 2021) she sent to Dr. Koola asking him to stop sending excessive and harassing emails. Ex. 9 to Def. Mot. at 7–8. In her email to Dr. Koola, Rowland told him he did "not have [her] permission to contact [her] in any way" and that "[t]he appropriate [University of Maryland] parties have been notified of the ongoing, harassing emails" from Dr. Koola to Rowland. *Id* at 7. Her email stated that Dr. Koola had "continued to send intimidating, offensive, and angry emails to [her] from [his] professional (Stony Brook) account" and that the emails "reflect [his] harassing behavior conducted from [his] professional institution." *Id.* at 8. Rowland stated that Dr. Koola was continuing to send emails from his SBU account. *Id.*

Also on June 18, 2021, Plaintiff forwarded the email he received from Rowland to Susan Blum, SBU's Chief Counsel. Def. Response to Pl. Rule 56.1 Counterstatement ¶ 52. Blum, on June 20, 2021, asked Plaintiff whether he had "[a]ny problem with [her] talking to university police." Sealed Ex., ECF No. 34.[5]

## II.    Dr. Wertheim's Actions Following Notification of Dr. Koola's Conduct

In late July 2021, Dr. Wertheim received a set of emails spanning in time from October 2019 through June 2021 regarding Dr. Koola from the Office of General Counsel. Wertheim Decl. ¶ 20, ECF No. 51-8; Pl. Response to Def. 56.1 Statement ¶

---

[5] Though Defendants initially litigated whether this email could be included in the record, the parties ultimately stipulated that it could be used by Plaintiff. *See* Stipulation Concerning the Submission in Summ. J. Filings of Certain Evidence, ECF No. 47-1.

14;  Def. Response to Pl. Rule 56.1 Counterstatement ¶ 53. Blum scheduled a videoconference with Dr. Wertheim and told him about Dr. Koola's emails and Dr. Koola's visit to a person he did not know.  Def. Response to Pl. Rule 56.1 Counterstatement ¶ 54–55.

Dr. Wertheim testified that when he learned of Dr. Koola's conduct, his first concern was ending Dr. Koola's employment with SBU. Wertheim Dep. A 83:2–5; Wertheim Decl. ¶¶ 39–40.  Dr. Wertheim told Plaintiff to "non-renew" Dr. Koola, which meant not renewing his current employment. Wertheim Dep. A 83:6–9, 20:18–21; Wertheim Decl. ¶¶ 41–43. Dr. Koola was notified that he was being non-renewed on August 13, 2021 and that that date would be his last day of employment. Termination Notice from Dr. Parsey to Dr. Koola (Aug. 13, 2021), Ex. 10 to Def. Mot., ECF No. 51-13; Termination Letter from Dr. Wertheim to Dr. Koola (Aug. 13, 2021), Ex. 11 to Def. Mot, ECF No. 51-14.

According to Dr. Wertheim, he "elected to non-renew [Dr. Koola], rather than pursu[e] disciplinary proceedings" because he "wanted to end Dr. Koola's employment with SBU as quickly as possible."  Wertheim Decl. ¶ 49. "In light of the institutional risks and reputational harm caused by Dr. Koola's behavior, which seemed likely to continue and possibly escalate, the prospect of paying Dr. Koola the balance of the salary on the remainder of his notice period was preferable to keeping him on staff." *Id.*

On August 13, 2021, Dr. Wertheim wrote to the New York Office of State Comptroller, Bureau of State Payroll, that Dr. Koola's separation of service was "in

no way connected to disciplinary matters." Letter from Dr. Wertheim to Brian Moultan, Ex. 19 to Pl. Response to Def. Mot. for Pre-Motion Conf., ECF No. 33-22.

## III.    Plaintiff's Removal as Chair of the Psychiatry Department

In making his decision to remove Plaintiff as Chair of the Psychiatry Department, Dr. Wertheim consulted with university counsel, the Provost, and President of Stony Brook University Defendant McInnis.  *See* Wertheim Dep. B 74:23–77:8.  "The substance of the meeting was about the actions of Dr. Koola and what the appropriate response was and what Dr. Parsey's responsibility was, and should have been, and whether or not my intention to dismiss him from being Chair was a reasonable response."  *Id.* at 77:2–8.    Blum spoke at the meeting, and "President McInnis agreed and concurred with the decision to dismiss Dr. Parsey as chair of psychiatry."  Wertheim Dep. B 89:21–24; McInnis Dep. Tr.  48:3–15, ECF No. 33-6.

Dr. Wertheim met with Plaintiff on September 1, 2021 and informed him he was being dismissed as Chair of the Psychiatry Department. Wertheim Dep. A 69:23–70:6; Pl. Response to Def. 56.1 Statement ¶ 57. That same day, Dr. Wertheim memorialized the reason for the decision to remove Plaintiff as Chair.  Document by Dr. Wertheim dated (Sept. 1, 2021), Ex. 3 to Def. Mot., ECF No. 51-6.  In a document dated September 1, 2021, Dr. Wertheim wrote:

> "I met with Dr[.] Parsey with John Riley joining us.  I explained that the University was investigating the issues around Dr. Maju Koola, and that in the process of the investigation it became evidence that Dr. Parsey had known about these activities for nearly 2 years.  I reviewed that the activities included excessive and harassing emails, inappropriate comments, and other behavioral lapses, and that this put

the University at significant legal and reputational risk.  I said as a result (I added though this was painful as I like Dr[.] Parsey) I could not let him continue as chair of Psychiatry . . . .

. . . . He stated that he thought this was excessive and that he thought each time he counseled Dr[.] Koola he improved and stopped doing the behavior which was problematic.  He said he couldn't stop people from speaking freely.  I said that he should have brought this to the attention of LR, or Legal, or OEA, or someone earlier; that the behavior was harassing and possibly criminal; and that the means to stop him was what we ultimately did which was to non-renew him."

*Id.*

As a result of being removed as Chair, Plaintiff's annual compensation was decreased by $248,000.  Def. Response to Pl. Rule 56.1 Counterstatement ¶ 81. Defendants do not dispute that "[o]ther than the situation with Dr. Koola, there was nothing else that Dr. Wertheim believed Dr. Parsey was doing wrong as Psychiatry Chair."  Def. Response to Pl. Rule 56.1 Counterstatement ¶ 84; Wertheim Dep. B 31:16–19.  For the same reasons that led him to determining Plaintiff could no longer serve as Chair, Dr. Wertheim recommended postponing Plaintiff's consideration for Distinguished Professor.  Wertheim Decl. ¶ 82.

Plaintiff admits he has never heard Dr. Wertheim nor Dr. McInnis make any comments about Iranian-Americans, derogatory or otherwise.  Pl. Response to Def. Rule 56.1 Statement ¶¶ 92–93.

## IV.    Additional Facts

Sometime in 2018, Blum informed Plaintiff that the First Amendment prevented Stony Brook University from punishing a faculty member for the faculty member's speech, including the sending of emails.  Def. Response to Pl. Rule 56.1 Counterstatement ¶ 5.  Plaintiff had reached out to Blum about a faculty member

named Gabrielle Carlson, who was emailing negative things about Plaintiff to potential hires. *Id.* ¶ 6; *See* Parsey Decl. ¶¶ 3–5, ECF No. 33-2. Plaintiff was also told by the legal department that he could not censor faculty members for their activities on their own time. Pl. Dep. Tr. 48:13–24, ECF No. 33-7 ("Pl. Dep. B"); Def. Response to Pl. Rule 56.1 Counterstatement ¶ 10.

In or around February 2021, Plaintiff announced he would step down as Chair of the Psychiatry Department. Pl. Response to Def. Rule 56.1 Statement ¶ 95. Dr. Wertheim learned of Plaintiff's intention in February or March of 2021 and was disappointed to learn of this decision. *Id.* ¶¶ 96–97. Dr. Wertheim tried to convince him to stay, and when Plaintiff changed course and notified him that he no longer intended to leave, Dr. Wertheim was happy. *Id.* ¶¶ 98–9.

In early 2023, an Associate Provost who was the head of a master's level and bachelor's level creative writing program was removed from his leadership role when it came to light that he failed to report allegations that a subordinate of his was engaged in sexual misconduct. Pl. Response to Def. Rule 56.1 Statement ¶ 100. That Associate Provost is a white male. *Id.* ¶ 101.

## DISCUSSION

For the reasons discussed below, Plaintiff has not raised a viable claim of employment discrimination on the basis of race under the Equal Protection Clause of the Fourteenth Amendment, for which he seeks to hold Defendants liable pursuant to 42 U.S.C. § 1983. Upon granting Defendants' motion for summary judgment with

regard to the equal protection claim, the Court further declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

## I.    Plaintiff's Equal Protection Clause Claim Raised Under 42 U.S.C. § 1983

Plaintiff brings his lone federal cause of action in this lawsuit under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, through 42 U.S.C. § 1983, instead of through Title VII of the Civil Rights Act of 1964. Under the heightened causation standard applicable to § 1983 equal protection claims, Plaintiff has not raised a viable claim of employment discrimination.

### A.    Standard for 42 U.S.C. § 1983 Employment Discrimination Claims

Evaluating constitutional employment discrimination claims under § 1983 at the summary judgment stage has similarities and differences to evaluating Title VII employment discrimination claims. As with Title VII claims, the Court must evaluate the § 1983 claims employing the three-part burden-shifting analysis provided by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, n.1 (1993) (stating in dicta that the Court "shall assume that the *McDonnell Douglas* framework is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. § 1983"); *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019) (stating that courts "employ the *McDonnell Douglas* framework to analyze § 1983 claims" and applying the framework to a § 1983 sex-based employment discrimination claim); *Radice v. Eastport South Manor Central Sch. Dist.*, 437 F. Supp. 3d 198, 209 (E.D.N.Y. 2020)

(stating that "[d]isparate treatment and retaliation pursuant to § 1983 are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*").

Under the first step of the *McDonnell Douglas* framework a plaintiff must establish a *prima facie* case of discrimination by showing that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (internal quotation marks omitted). If the plaintiff establishes a *prima facie* case of discrimination, then under the second step, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (internal quotation marks omitted). If the defendant employer "carries that burden, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment discrimination was more likely than not based in whole or in part on discrimination." *Id.* (internal quotation marks omitted). Under the third step, "[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Ctr.*, 509 U.S. at 519.

However, the Second Circuit has emphasized that "at the third step of the *McDonnell Douglas* analysis, a plaintiff asserting a § 1983 claim bears a higher burden in establishing that the employer's alternative, nondiscriminatory reason for the adverse employment action is 'pretextual.'" *Naumovski*, 934 F.3d at 214.

14

Whereas "a Title VII plaintiff need only prove that the employer's stated non-discriminatory reason was *not the exclusive* reason for the adverse employment action," the § 1983 plaintiff "must establish that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action." *Id.* at 214–15. "In other words, a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Id.* at 215. Thus, the § 1983 plaintiff must establish "'but-for' causation" — that "the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action." *Id.* at 213–14.

Additional differences between employment discrimination claims raised under § 1983 and Title VII include that the § 1983 plaintiff, unlike the Title VII plaintiff, must allege that the alleged deprivation was committed by a person acting under color of state law; that the § 1983 plaintiff, unlike the Title VII plaintiff, may bring their claim against any individual responsible for the discrimination and not just the employing entity; and that the § 1983 plaintiff must raise their claim against an individual defendant who has personally violated their constitutional rights,[6]

---

[6] As a threshold matter, Defendants argue that Plaintiff's equal protection claim against McInnis cannot proceed "because she was not involved in [the] employment decision[s]" to remove him as Chair or to postpone his consideration for Distinguished Professor. Def. Mem. in Support of Mot. for Summ. J. 18 ("Def. Mem."), ECF No. 51-1. Because the record and evidence make clear that Plaintiff does not have a viable equal protection claim, the Court does not reach whether the record suggests a triable question of fact on whether Dr. McInnis played a role in Plaintiff's adverse employment action(s).

whereas agency principles allow discriminatory intent under Title VII to be attributed to the employer. *Naumovski*, 934 F.3d at 212.

B. Plaintiff's § 1983 Claim Fails Under the Third Step of the *McDonnell Douglas* Analysis.

For purposes of this decision, the Court assumes (but does not hold) that Plaintiff has successfully established a *prima facie* case of employment discrimination under the first step of the *McDonnell Douglas* analysis: his race and national origin place him in a protected class;[7] he was qualified for the position of Chair; his removal as Chair was an adverse employment action; and there is a sufficient inference of discrimination as a basis for that adverse employment action.[8] And Defendants have offered a legitimate, nondiscriminatory reason for the adverse employment action — that they believed Plaintiff did not appropriately handle the misconduct of one of his subordinates — at the second step of the analysis. But critically, at the third step of the analysis, Plaintiff fails to meet the burden of proof

---

[7] Plaintiff specifically references his race in his cause of action under the Equal Protection Clause of the Fourteenth Amendment and references race and national origin in his related claim under the New York State Human Rights Law. Either Plaintiff's race or national origin would satisfy the protected class element of the *McDonnell Douglas prima facie* case.

[8] Plaintiff may not have established the final element necessary to assert a *prima facie* case at the summary judgment stage — whether there is an inference of discrimination. Plaintiff argues that he has made this showing, and further argues that Defendants have conceded this point because they failed to argue otherwise in their motion papers. Pl. Mem. in Opp'n to Def. Mot. 20 & n.82, 21 ("Pl. Mem."), ECF No. 52. Defendants instead focus their argument on how, regardless of whether Plaintiff established a *prima facie* case, he fails at the third step of the *McDonnell Douglas* analysis. *See* Def. Mem. in Support of Mot. for Summ. J. ("Def. Mem.") at 19, ECF No. 51-1).

16

that applies in the § 1983 context: "that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action." *Naumovski*, 934 F.3d at 214–15.

### 1. Even in the Light Most Favorable to Plaintiff, the Record Belies the Claim that Discrimination was the "But-For" Cause of Plaintiff's Removal as Chair.

Plaintiff argues that a rational jury could find that Defendants' proffered reason was pretextual "from the sheer incongruity that [Plaintiff] was removed as Chair for failing to discipline Dr. Koola for conduct that was <u>not</u> prohibited by any Stony Brook policy"; from Dr. Wertheim's decision to not immediately suspend Dr. Koola and allow him to be paid for the duration of his contract, which Plaintiff argues suggests Defendants "were not actually troubled by [Plaintiff's] conduct concerning Dr. Koola"; from Defendants' failure to ask Plaintiff why he had not acted differently toward Dr. Koola; from Defendants' failure to communicate to other department chairs that they had an obligation to address off-campus conduct; and from Defendants' failure to take any action against Dr. Abi-Dargham, the Psychiatry Vice-Chair, about her handling of a complaint she received about Dr. Koola. Pl. Mem. of Law in Opp'n to Def. Mot. 22–24 ("Pl. Mem."), ECF No. 52.

Even in the light most favorable to Plaintiff, however, the record does not support his claim of pretext. First, regardless of whether Dr. Koola's conduct violated a specific disciplinary policy, Dr. Wertheim declared he "wanted to end Dr. Koola's employment with SBU as quickly as possible" due to "the institutional risks and reputational harm caused by Dr. Koola's behavior, which seemed likely to continue

17

and possibly escalate . . . ." Wertheim Decl. ¶ 49. He further declared that his "impression from the emails was that Plaintiff was aware of the reputational harm to SBU caused by Dr. Koola's excessive emails to individuals outside the SBU community." *Id.* ¶ 53.

Second, Dr. Wertheim offered a viable *and* unrefuted reason for choosing to non-renew Dr. Koola's contract (which would require paying him for the duration of the contract) instead of disciplining him: due to the operative Collective Bargaining Agreement, if SBU had elected to initiate disciplinary proceedings against Dr. Koola, it would have set in motion a process "that could have lasted months" and "Dr. Koola would have remained employed with SBU that entire time." Wertheim Decl. ¶¶ 46–48. His decision to non-renew, instead of initiate disciplinary proceedings, was "to end Dr. Koola's employment with SBU as quickly as possible." *Id.* ¶ 49.

Third, Defendants' failure to communicate to other department chairs about addressing off-campus conduct, if true, does not support pretext. Instead, that fact could support Defendants' assertion that they believed Plaintiff's failure to escalate Dr. Koola's conduct was a clear dereliction of his duties as Chair. Finally, as Defendants argue, Dr. Abi-Dargham elevated the complaints she received to her boss, Plaintiff, who was the Chair of the Department, and Defendants' failure to reprimand her does not suggest pretext. Ex. 16 to Pl. Response to Def. Mot. for Pre-Motion Conf. 1, ECF No. 33-19.

Neither are Plaintiff's arguments that Dr. McInnis hired three white men of American descent into unrelated leadership positions, nor that Dr. Wertheim

18

replaced him with a less qualified white male, availing.  Pl. Mem. at 18.  On Dr. McInnis's hiring, the men were hired into unrelated employment positions, and there is no evidence in the record about any lack of qualification on their part.  On Dr. Wertheim's hiring, the white male was only appointed as Interim Director, and Dr. Wertheim testified that his decision to appoint that man as Interim Chair, even though he was from a different department, was to avoid giving an edge to candidates within the Psychiatry Department that had previously expressed interest in the Chair position.  Wertheim Dep. Tr. 131:4–134:2, ECF No. 55-3 ("Wertheim Dep. C").  Furthermore, the ultimate permanent Chair who was selected was Dr. Abi-Dargham, who is not a white male. *Id.* at 134:15–135:25.

### 2. *Decisional Law Underscores that Plaintiff's Claim Does Not Satisfy the Third Step of* McDonnell Douglas.

The Second Circuit's decision in *Naumovski* also compels the conclusion that Plaintiff fails at the third step of the *McDonnell Douglass* analysis.  The *Naumovski* plaintiff argued that she was terminated from her employment as an assistant coach for a women's basketball team because of animus toward women.  934 F.3d at 215.  The primary basis for inferring discriminatory animus was an alleged statement by an athletic official to the plaintiff that "your problem is that you're a single female in your mid-30s." *Id.*  Other "indicia of discrimination" the district court relied upon was that supervisors interpreted rumors about plaintiff as suggesting a sexual relationship between her and a student, rather than mere favoritism from one to the other. *Id.* at 216.  The plaintiff, however, admitted that one of the defendants informed her of "a concern by some players that they weren't being coached equally"

and that the plaintiff's emotional state was "affecting [her] work." *Id.* at 17. The record further showed substantially undisputed performance issues by plaintiff after a satisfactory 2008–2009 performance evaluation, *id.* at 217–18, including that the plaintiff's personality and coaching style clashed with one of the defendant's and that her relationship with that defendant needed improvement. *Id.* at 218.

The Second Circuit held that though the record may permit a rational juror to infer that the defendants' decision to terminate the plaintiff was "more likely than not motivated *in part* by sex-based discrimination," which would satisfy the Title VII standard, a reasonable jury in a Section 1983 equal-protection action could not infer that sex-based stereotyping was a "but-for" cause of the termination. *Id.* The Court first determined that the comment about the plaintiff being a single female in her mid-30s was "the sort of 'stray remark' that is insufficient to support an inference of discriminatory intent" and that, even if the supervisors interpreted the rumors as the district court found, "that fact provides no additional support for a conclusion that [the athletic officials'] own actions were based on discriminatory animus toward women generally or any subcategory of female employees in particular." *Id.* at 216.

The Court next acknowledged that the "single female in your mid-30s" remark, along with the defendants' allegedly inappropriate reaction toward the rumors about the plaintiff and the student, "might raise an inference of sex-stereotyping, especially in light of [the plaintiff's] apparently satisfactory performance record." *Id.* at 216. The Court, however, rejected that theory as a basis for the plaintiff to succeed, because the plaintiff failed to demonstrate that "a reasonable jury could find that

20

[d]efendants would not have terminated her based on their stated reasons" related to her performance "alone." *Id.* at 17. The Court noted that the one "single female in your mid-30s" comment was "scant support" for sex stereotyping. *Id.* The Court further noted that the plaintiff failed to present evidence that the defendants' stated reason for terminating her was false or inadequate. *Id.*

Here, as in *Naumovski*, no reasonable jury could infer that discrimination based on Plaintiff's race (or national origin) was a "but-for" cause of his removal as Chair. Plaintiff has provided no evidence in the record demonstrating any discriminatory animus by Defendants against members of his protected class. Indeed, unlike the *Naumovski* plaintiff, Plaintiff is unable to provide even a "stray remark" that could provide "scant support" for a discrimination claim based on his race or national origin. *Id.* at 216, 217. While, like the *Naumovski* plaintiff, Plaintiff has presented evidence of positive performance in his role as Chair, he has not refuted the evidence that Defendants concluded that his handling of a subordinate's conduct was inappropriate and warranted his removal from the position of Chair. The only bases for Plaintiff's assertion that Defendants' reason for his removal as Chair was pretextual are arguments he levies on his handling of Dr. Koola's conduct being reasonable. But if Plaintiff is correct that he handled Dr. Koola's conduct in a reasonable manner given his understanding of Stony Brook's disciplinary policies and how the First Amendment impacted his ability to regulate employees' speech, that does not override the record evidence that Dr. Wertheim, in consulting with President McInnis and Blum, *believed* Plaintiff's handling of Dr. Koola to be inappropriate and

21

warranting of removal as Chair.  When reviewing employment discrimination claims, the Court does "not sit as a super-personnel department that reexamines an entity's business decisions," *see Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (internal quotation marks omitted), and instead focuses its inquiry on the presence (or absence) of evidence that discriminatory animus was the but-for cause of an adverse employment action.  *See id.* at 169–70.

Additional cases underscore that Plaintiff has failed to meet his burden under the third step of the *McDonnell Douglass* framework; where defendants provide evidence demonstrating a legitimate basis for their decision and a plaintiff fails to provide affirmative evidence to support a claim that discrimination was the actual cause of the adverse employment action, the plaintiff's case fails.  In *Chislett v. New York City Department of Education*, the court held that the plaintiff failed to demonstrate racial discrimination was a "but-for" cause of the decision to remove plaintiff's supervisory authority.  No. 21-CV-9650 (JLR), 723 F. Supp. 3d 285, 295–97 (S.D.N.Y. 2024).  The court pointed to the "'almost universal' 'pattern of feedback from nearly every member of the team that expressed that they did not believe [plaintiff] to be an effective leader and that they believed that she created chaos and a negative work environment'"; that at least three white employees complained to the supervisor, who is also white, about the (white) plaintiff's leadership; that the department's Office of Equal Opportunity and Diversity Management report independently concluded the plaintiff had made inappropriate comments to team

members; and that the plaintiff provided no evidence beyond conclusory statements to dispute the proffered reasons for the demotion. *Id.*

Similarly, in *Radice*, the court held that a § 1983 plaintiff asserting sex discrimination for the decrease of her pay and assumption of a less distinguished position as a part-time athletic trainer failed at the third step of the *McDonnell Douglass* analysis. 437 F. Supp. 3d at 212. The court pointed to the undisputed evidence that the number of teams and student athletes grew dramatically; that defendants were concerned about the ability of the athletic trainer to cover nights and weekend practices; that the plaintiff was unavailable as a trainer during those times; that there were times plaintiff was not present when a student athlete was injured; and that the plaintiff refused to perform athletic trainer duties without additional compensation. *Id.*

Here, as in *Chislett* and *Radice*, Defendants have provided clear, logical, and record-backed reasons for the decision to remove Plaintiff as Chair of the Psychiatry Department, and Plaintiff's refutations are largely conclusory statements to dispute the proffered reasons for demotion. *Chislett*, 723 F. Supp. 3d at 297. (A number of Plaintiff's responses to Defendant's Rule 56.1 Statement state "Denies that [Defendant's] testimony . . . is credible given the strong evidence of pretext" (*see, e.g.,* Pl. Response to Def. Rule 56.1 Statement ¶ 47)).

*Rodriguez v. American Friends of Hebrew University, Inc.* further illustrates why Plaintiff's claim fails at the third step of the *McDonnell-Douglas* analysis. No. 96-CV-240 (GEL), 2000 WL 1877061, at *5 (S.D.N.Y. Dec. 26, 2000). The *Rodriguez*

23

plaintiff, a woman of Filipina national origin, alleged she was terminated from her position in the Management Information Services (MIS) department of her nonprofit employer on the basis of her national origin, sex, and age. *Id.* at *1–2. The plaintiff disputed her employer's allegations that she performed poorly. *Id.* at *3. The record showed that one defendant referred to plaintiff as a "coward" or "wimp," and plaintiff testified that that defendant mimicked her accent. *Id.* at *4–5. The court nevertheless granted summary judgment, pointing to complaints about the plaintiff's job performance and plaintiff's failure to back up data, which was a responsibility of her position, as valid, non-discriminatory reasons for termination. *Id.* at *3. The court found that "the record is totally devoid of any affirmative evidence that defendants were biased against Asians, women, or persons over age 40." *Id.* at *4. The court stated that when the "plaintiff's own testimony is the only basis for contesting otherwise strong evidence of valid, non-discriminatory reasons for termination, the evidence of 'pretext' cannot alone support a reasonable inference of prohibited discrimination." *Id.* at *5.

In *Rodriguez*, even though the plaintiff disputed the accuracy of defendants' assertions on complaints about her job performance and pointed to her "long former service" with the employer as "evidencing her competence," the court pointed to the lack of "a single remark suggesting prejudice" against plaintiff or people with her race, gender or age. *Id.* at *3–*4. The court further noted that although a man was hired to replace plaintiff, a woman held the job before plaintiff. *Id.* at *5. The court also pointed to the fact that one of the defendants who the plaintiff claimed fired her

24

had previously transferred her to another job when the department downsized and then offered her to return to the job before her termination. *Id.* at *5. The court stated that "it is difficult to impute bias against plaintiff's protected class(es) where the person who made the adverse employment decision also made a recent favorable employment decision regarding plaintiff." *Id.* at *5 (citing *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)). Finally, the Court pointed to how there was evidence of other employees of the plaintiff's national origin employed by the company and how the employer and one of the individual defendants were helpful to plaintiff when she traveled to the Philippines to bring her children to the United States. *Id.* at *5. In total, the Court concluded that the "[p]laintiff thus create[d] an issue of fact about whether she did a poor job, but present[ed] no direct evidence that defendants did not *believe* she did a poor job, and thus very little basis for concluding that the proffered explanation was false." *Id.*

Here, as in *Rodriguez*, Plaintiff points to indicators of positive job performance in his role as Chair, as well as the appointment of a white male as an interim Chair after his removal. Wertheim Dep. C 131:4–133:18. Nevertheless, the record also shows that Dr. Wertheim made positive efforts to keep Plaintiff in his role as Chair in the past, and even if a person outside Plaintiff's protected class was for some time appointed (Interim) Chair, a woman with a different identity was also appointed to the position. *Id.* at 134:15–135:35. Unlike the *Rodriguez* plaintiff, who could point to some remarks (being called a "coward" and a "wimp" and having her accent mimicked) that might support an inference of animus, Plaintiff acknowledges that he

25

has never heard Dr. Wertheim nor Dr. McInnis make any derogatory comments about Iranian-Americans.  Pl. Response to Def. Rule 56.1 Statement ¶¶ 92–93.  Like the *Rodriguez* plaintiff, even if Plaintiff has shown "an issue of fact about whether []he did a poor job" in handling Dr. Koola's conduct, he "presents no direct evidence that defendants did not *believe* []he did a poor job, and thus very little basis for concluding that the proffered explanation [for his removal as Chair] was false."  2000 WL 1877061, at *5.  As in *Rodriguez*, "the record is totally devoid of any affirmative evidence that [D]efendants were biased . . . . "  *Id.* at *4.  Plaintiff's case is not one establishing "[a] flimsy excuse for an adverse employment action, coupled with powerful evidence that the excuse is contrived, and a lack of plausible alternative explanations."  *Id.* at *5.

Finally, Defendants argue that the "same actor inference" further supports their motion for summary judgment.  Def. Mem., at 14–15.  The "same actor inference" reflects the principle that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.  This is especially so when the firing has occurred only a short time after the hiring."  *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *see Hyek v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 101–02 (E.D.N.Y. 2010), *as amended* (Mar. 25, 2010) (applying inference where person who terminated plaintiff's employment previously "promoted [p]laintiff on multiple occasions as well as authorized numerous increases in salary"), *aff'd*, 461 F. App'x 59 (2d Cir. 2010).  Courts have applied the inference

beyond instances of hiring and firing.  *See, e.g.*, *Figueroa v. New York Health & Hosps. Corp.*, 500 F. Supp. 2d 224, 236 (S.D.N.Y. 2007) (applying inference where supervisor who denied sick leave previously approved plaintiff for promotion).

Here, Plaintiff does not dispute that in February 2021, he announced his intention to step down as Chair and that when Dr. Wertheim learned of that intention, he was "disappointed," "tried to convince [Plaintiff] to stay," and that Dr. Wertheim "was happy when he learned that Plaintiff had decided to stay on as Chair." Pl. Response to Def. Rule 56.1 Statement ¶¶ 96–99. Defendants argue that by "try[ing] to convince [Plaintiff] to stay on as chair," Dr. Wertheim's actions call for the Court to draw a same-actor inference much as it would if Dr. Wertheim had hired him for the position or promoted him.  However, Dr. Wertheim's attempts to convince Plaintiff to remain as Chair in February 2021 occurred more than two years before Dr. Wertheim's decision to remove Plaintiff as chair, and a long passage in time can weaken the same actor inference.  *See, e.g.*, *Sharon Council v. Tri-Star Constr. Co.*, No. 1-CV-11788 (BSJ), 2004 WL 253298, at *3 (S.D.N.Y. Feb. 10, 2004) ("Where, as here, the interim period is under two years, the same actor inference remains significant." (internal quotation marks omitted)).

Nevertheless, whether or not the same actor inference applies, Defendants are correct that — in light of the record presented and the undisputed facts — Dr. Wertheim's previous encouragement of Plaintiff to stay on as chair, with Plaintiff's case devoid of any other evidence of pretext, supports Defendants' argument that the reason provided was not pretextual and that Defendants did not discriminate against

Plaintiff on the basis of his race or national origin.  Accordingly, because Plaintiff has failed to present any evidence from which a reasonable jury could conclude that discrimination was the but-for cause of his removal as Chair of the Psychiatry Department, Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

## II.    Plaintiff's State Law Claims

Plaintiff raises state claims under the New York State Human Rights Law (NYSHRL) (arguing employment discrimination on the basis of race and national origin), New York Labor Law § 741 (arguing that Defendants retaliated against him for his opposition to, and disclosure to a supervisor of, conduct constituting improper quality of patient care), and the New York False Claims Act (NYFCA) (arguing that Defendants retaliated against him for his efforts to stop false claims under the law). Compl. ¶¶ 54–59.[9]  The NYFCA claim is brought under State Finance Law § 191.

Because the Court grants summary judgment on Plaintiff's federal employment discrimination claim, the Court now considers whether it will, as a

---

[9] Plaintiff alleges he was removed as Chair shortly after he objected (in August 2021) to Stony Brook University's decision to leave a patient with COVID-19 in the inpatient psychiatric unit instead of moving that patient into a medical unit.  Def. Response to Pl. Rule 56.1 Counterstatement ¶¶ 72–77.  That allegation relates directly to Plaintiff's Labor Law § 741 claim, as that statute prohibits retaliatory action against employees who disclose or threaten to disclose to a supervisor a policy or practice of the employer that the employee reasonable believes constitutes improper quality of patient care or improper quality of workplace safety. To the extent Plaintiff alleges his objection related to the patient with COVID-19 applies to his equal protection claim — though he does not discuss it in the context of that claim — the same reasoning discussed above (regarding Plaintiff's failure to demonstrate his race was a but-for cause of his removal as Chair) applies.

matter of discretion, exercise supplemental jurisdiction over Plaintiff's state law claims. A district court "may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Supreme Court has indicated that "decisions of state law should be avoided both as a matter of comity and to promote justice between the parties," and that "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 308 (2d Cir. 2003) (vacating district court decision where court exercised supplemental jurisdiction over state law claims involving novel and complex issues of state law and where plaintiffs previously abandoned federal claims). There is no reason to depart from that general rule here.

Thus, the Court will not exercise supplemental jurisdiction over Plaintiff's state law claims, and they are dismissed without prejudice for Plaintiff to pursue those claims in state court.

## <u>CONCLUSION</u>

For the reasons discussed above, the Court <u>grants</u> Defendants' motion for summary judgment on Plaintiff's employment discrimination claim raised under the Equal Protection Clause through 42 U.S.C. § 1983. The Court declines to exercise supplemental jurisdiction on Plaintiff's state law claims under 28 U.S.C. § 1367(c)(3).

SO ORDERED.

*/s/ Nina R. Morrison*

NINA R. MORRISON
United States District Judge

Dated:  September 24, 2025
           Brooklyn, New York